In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3002

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JACOB K. WESSEL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cr-00201-TWP-TAB-1 — **Tanya Walton Pratt**, *Chief Judge.*

ARGUED OCTOBER 30, 2020 — DECIDED JUNE 29, 2021

Before MANION, ROVNER, and SCUDDER, *Circuit Judges.*

MANION, *Circuit Judge.* Jacob Wessel had a history of mental issues. On August 11, 2016, he allegedly raised a gun toward a police officer. A grand jury indicted him for the crime of being a felon in possession of a firearm. This case traveled a long, zig-zag path. Defense counsel moved the judge multiple times to find Wessel not competent to stand trial. The judge ordered three 45-day evaluations of Wessel by mental-health experts. Defense counsel also sent multiple mental-

health experts to evaluate Wessel. The judge held three competency hearings. She determined he was competent to stand trial, so he did. But trial was not smooth. Wessel exploded into a tirade of profanities and accusations in front of the venire, so the judge sent him to a remote room where he stayed for most of the trial. The jury convicted him. The judge sentenced him to 100 months in prison. He argues the judge erred in concluding he was competent. He asks us to vacate the conviction. But the judge committed no reversible error.

## I. Alleged occurrence facts

On August 11, 2016, when Wessel was about 31, someone reported to police that he talked about suicide and stole a car. When police found the car and Wessel, he ran. They cornered him and ordered him to the ground. He refused. He told them to shoot his head. They refused. He said, "Well, if you're not going to do it …" and he drew a gun and raised it toward an officer. Police shot the gun out of his hand and shot his shoulder. Wessel was charged as a felon in possession of a firearm.

## II. Competency evaluations, hearings, and determinations

### A. First motion to determine competency

In March 2017, defense counsel moved for a competency examination and hearing.[1] Finding reasonable cause to think Wessel might be incompetent, the judge granted the motion.

### B. Dr. Callaway's first report

Defense counsel referred Wessel to Dr. Stephanie Callaway. She interviewed him in jail on November 18 and

---

[1] Defense counsel also moved for an evaluation of whether Wessel was sane at the time of the alleged offense. This issue is not before us.

December 3, 2016, and she reviewed records. She issued her
first report on April 16, 2017. Wessel was born in 1985. He said
his mother raised him. He did not see his father often. His fa-
ther tortured him and his little brother and was diagnosed
with schizophrenia. Wessel said his ex-girlfriend set him up
and Chicagoans were trying to kill him. He said he saw them
wherever he went. He reported doing generally well in high
school and for 2.5 years in college. He described a lengthy his-
tory of substance abuse, including crack cocaine and metham-
phetamines. He said meth "'makes you slowly lose your
mind … .'" He described a history of mental-health treatment
since childhood. He said, "'I was real hyper, I was a wild kid,
off the hook, a bad kid … .'" He was diagnosed with ADHD.
"'I raised hell in class and I didn't care; I had some kinda drive
and it pushed me to act out.'" He took Ritalin and Concerta
from the ages of 5 or 6 to 18. Inpatient psychiatric units admit-
ted him about 20 times. He described a history of depression,
hypomania, hallucinations, paranoia, and delusions. He was
reticent to discuss his auditory hallucinations.

Dr. Callaway opined that many of his beliefs were delu-
sional. He said people were trying to kill him. Dr. Callaway
summarized extensive records, noting suicide attempts and
diagnoses of anxiety disorder, agoraphobia with panic disor-
der, polysubstance abuse, antisocial personality disorder, ma-
jor depressive disorder, episodic mood disorder, suicidal ide-
ation, bipolar disorder, and paranoid delusion. He was not on
psychotropic medications as he did not like how they made
him feel. She diagnosed him with schizoaffective disorder
and multiple substance use disorders, and she ruled out bor-
derline personality disorder. He was reluctant and embar-
rassed to talk about his delusions and hallucinations. He
demonstrated a generally logical and correct understanding

of the courtroom procedures and personnel, and of his current legal situation. But she noted deficits in his ability to aid in his defense. She was concerned about his ability to disclose pertinent information, engage in meaningful discussions about the case, and work with his attorney. His depressive symptoms affected his decision-making and motivation. He had delusions about hitmen. She opined that his depressive symptoms and delusions would make it difficult for him to make decisions about his case and aid his attorney. She concluded "he lacks the ability to assist in his defense due to his delusions and depressive symptoms."

## C. Dr. Campbell's report

Wessel was taken to the Federal Medical Center in Lexington, Kentucky, to be examined by Dr. Judith Campbell from April 20 to June 5, 2017. She interviewed him and reviewed records. Staff examined and observed him. She submitted her report on June 29, 2017. He largely cooperated. He said he first received mental-health treatment at the age of 5. He was diagnosed with ADHD and prescribed Ritalin and Tenex. His parents divorced when he was 6 or 7. His schizophrenic father physically abused him. He got into a lot of trouble during kindergarten for excessive talking, hitting, and throwing gravel. His behavior improved by the end of kindergarten. He graduated from high school with good grades and was on the wrestling team. He went to college and earned good grades for the first two years, but then his grades plummeted in his fifth semester. He said he dropped out of college because he was "'doing drugs.'" He reported numerous psychiatric hospitalizations as an adult. Dr. Campbell's review of the records found Wessel's childhood unremarkable for mental-health problems, with the exception of kindergarten problems. He

was incarcerated from 2009 through 2013. He refused to leave the facility on his release date. He finally left in August 2013, with diagnoses of anxiety disorder, agoraphobia with panic disorder, polysubstance abuse, and antisocial personality disorder. From 2013 through 2016, Wessel went to the hospital over 30 times for a wide variety of symptoms, including suicidal ideation, paranoia, auditory hallucinations, aggressive behavior, depression, delusions, and substance abuse. "A consistent theme throughout his records suggests his suicidal and acting out behaviors occurred when he did not like something or wanted to affect some kind of change in his housing status or arrangement."

When Wessel arrived at FMC Lexington on April 20, 2017, he reported ADHD and depression, was prescribed Wellbutrin, and was put in an unlocked cell in the general inmate population. But apparently the next day he requested protective placement based on his report that other inmates were staring at him and that he feared gang members wanted to hurt him. His request was denied. He then threatened to "'hang myself before I let them kill me.'" So he went to suicide watch. While there, he told staff he was not suicidal, but only made that threat because he knew he would get a cell by himself. On April 24, 2017, he was taken off suicide watch and put in the Special Housing Unit. Staff did not observe Wessel having any problems understanding or following directions. A test indicated he exaggerated his mental-health symptoms.

Dr. Campbell opined he understood the courtroom participants and proceedings, understood the charges against him, and was able to assist his attorney if he so chooses. She found his thoughts overall to be logical, sequential, rational, and non-delusional. He did not seem to respond to any internal

stimuli. When asked about his fears, he said he believed a gang was trying to kill him because it thought he raped someone's girlfriend. Other than this fear, Wessel was not distracted, preoccupied, or influenced by internal stimuli. Dr. Campbell concluded the results did "not support a finding of severe mental illness or mental defect sufficient to preclude his ability to proceed competently." She diagnosed him with borderline personality disorder with antisocial features and multiple drug disorders. She expressly ruled out schizoaffective disorder. She observed that he "demonstrated an ability to be cooperative and rational with the examiner when he chose to do so." She found him competent. She found no indication any mental illness presently impaired his perception or comprehension of his legal situation. "He described his legal situation in a rational, non-delusional, and reality-based manner." He "engaged calmly, cooperatively, productively, and realistically in interviews with the examiner about his case and would be expected to do the same with his attorney should he so choose." By October 2017, however, Wessel was no longer taking Wellbutrin or any other medication.

**D. Dr. Callaway's second report**

Dr. Callaway issued a second report on January 12, 2018. She had interviewed him a third time, on November 17, 2017. He told her, "'I get paranoid; there are real people after me.'" He said a team was hired to kill him. He was not taking psychotropic medications. She reached the same diagnoses as she did before: schizoaffective disorder and multiple drug use disorders, and she again ruled out borderline personality disorder. She noted he did not meet full criteria for a personality disorder, but has shown potential signs of borderline personality disorder. He said he recently told his attorney he did not

want to leave jail. She noted he "also cited reality based rea-
sons why he was scared to get out of jail, including difficulty
finding a job and housing as well as prior drug use." He as-
sessed himself and undermined that assessment in the same
breath: "'I'm competent, I'm fine, send me to prison … I don't
give a f***, I can't sleep.'" Pacing the room, he said, "'I'm just
crazy enough to go to trial and get 20 years instead of 10; I'm
tired of it all, people are after me, I see demons on and off
meth.'"

She found him unable to stay on task long enough to en-
gage in rational discussion about his case. She concluded that
although he understood the legal proceedings and the roles
of court personnel, he "lacks the ability to assist in his defense
due to his psychiatric symptoms." She determined:

> [H]e lacks the ability to rationally discuss his case with
> his attorney, weigh his options, and then make reason-
> able decisions on his own behalf in order to aid his at-
> torney in the preparation of his defense. … It is my
> opinion that Mr. Wessel has an understanding of the
> nature and consequences of the proceedings, but he
> lacks the ability to assist in his defense due to his delu-
> sions and manic symptoms.

### E. First competency hearing

The judge held the first competency hearing on January
18, 2018. Again, she found reasonable cause to think he might
be incompetent. She ordered another evaluation. So he went
to Chicago's Metropolitan Correctional Center for observa-
tion by Dr. Allison Schenk from February 20 to April 5, 2018.

**F. Dr. Schenk's first report**

Dr. Schenk issued her report on April 19, 2018. Wessel consistently refused to speak with her. But he would talk with others. She noted that during the 45 days, he did not show any symptoms of psychosis or mania. She opined that the single incident of depression might have been his attempt to get a preferred cell. She also noted his statements about "gang members" and "hitmen" changed, uncharacteristic for actual delusions. She diagnosed antisocial personality disorder and borderline personality disorder. She ruled out schizoaffective disorder. She concluded he was competent. She noted that "his maladaptive personality traits may prevent him from working with his attorney in a manner that is most effective or in his best interest," but "his decision to do so is considered volitional and not related to any mental illness."

**G. Second competency hearing**

The judge held a second competency hearing on June 5, 2018. Dr. Schenk and Dr. Campbell testified Wessel was competent. Dr. Schenk acknowledged she never saw Wessel's face throughout the entire 45-day evaluation because he declined to remove his blankets. She stood by her diagnoses of antisocial personality disorder and borderline personality disorder. Dr. Campbell testified he mostly cooperated with her. She testified that his responses to her questions demonstrated his ability to proceed competently. But Dr. Callaway testified he was not competent. She testified he had delusions about people trying to kill him. She opined that his depression and delusions would interfere with his ability to assist his counsel and would affect his decision-making. She diagnosed him with schizoaffective disorder.

**H. Judge's determination**

On June 11, 2018, the judge determined Wessel was competent. She discussed Wessel's background, including his good performance in high school and decent performance for about half of college before he dropped out, on drugs. He has a chronic history of substance abuse. He described a history of mental-health treatment since childhood. He said, "'I was real hyper, I was a wild kid, off the hook, a bad kid.'" The judge noted all three experts agreed he understood the proceedings against him and the roles of the courtroom players, so the sole issue was whether he was reasonably able to assist in his defense. She considered the evidence. Dr. Callaway evaluated Wessel in person twice in 2016 and once in November 2017 for a total of 4.5 hours. She opined he lacks the ability to assist in his defense due to psychiatric symptoms. She diagnosed him with schizoaffective disorder. When Wessel went to FMC Lexington in April 2017 for evaluation by Dr. Campbell, he responded to her. He was concerned about gang members trying to kill him. He manipulated staff by threatening suicide to get a single cell. He conversed rationally and calmly with her. She did not observe any functional impairments. She diagnosed him with borderline personality disorder with antisocial traits and expressly ruled out schizoaffective disorder. When he went to MCC Chicago in February 2018 for evaluation by Dr. Schenk, he again manipulated staff by lying about being suicidal to get a single cell. He refused to meet with Dr. Schenk. But he communicated with others. She diagnosed him with antisocial personality disorder and borderline personality disorder, and ruled out schizoaffective disorder.

The judge set out the proper *Dusky* competency standard: whether he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). She considered defense counsel's observations, which can be especially valuable. *See U.S. ex rel. Mireles v. Greer*, 736 F.2d 1160, 1165–66 (7th Cir. 1984). She determined Wessel's beliefs that his former girlfriend set him up and that someone is after him are "somewhat plausible (and may be intentionally exaggerated) given his history of substance abuse and criminal activity." The judge also noted that "Wessel's shift in the nature of the delusions is not consistent with genuine delusions," based on the opinions of Dr. Schenk and Dr. Campbell. The judge concluded that much of his conduct during his evaluations was "volitional and not compulsive." He chose to speak with some people, sometimes, but not with others. She opined that his desire to remain in custody "may be indicative of wanting to be some place safe and without responsibility, rather than a delusional request." He manipulated his way into single cells. The judge discounted Dr. Callaway's diagnosis of schizoaffective disorder because she only observed him for 4.5 hours and her last interaction with him was in November 2017. Dr. Schenk and Dr. Campbell, on the other hand, each evaluated Wessel over 45-day periods. And Dr. Schenk's evaluation ended recently—April 5, 2018. The judge granted he did not cooperate with Dr. Schenk, but noted he fully complied with Dr. Campbell and her tests. Relying on Dr. Schenk and Dr. Campbell, the judge concluded he was presently competent to assist in his defense, "if he chooses to do so."

### I. Wessel attempts to waive jury

On October 11, 2018, Wessel filed a waiver of trial by jury, signed by him and his attorney. The judge took it up at a pre-trial conference the same day. She asked him his name. He said, "Steve Wessel," though the records and his attorney call him "Jacob." She asked him his age. He said, "Sometime around 25," though the records show he was 33. She asked him his birthday. He said, "I'm not sure." He also said he was not sure how far he went in school or whether he ever worked. The judge asked him about his understanding of the differences between a jury trial and a bench trial. He said, "I guess." The judge decided he was unable to waive the jury. The defense previewed its appellate position: "if he's not competent to waive jury, he's not competent to appear in front of a jury." But the judge previewed our decision: "it's a different standard." She noted an effective waiver of the constitutional right to a jury must be knowing and voluntary. The judge granted he was mentally ill, but that does not automatically negate competence for trial. Defense counsel persisted: "I don't think he was competent on the day I met him on the day of his initial hearing, and I don't think he's competent today."

### J. Renewed motion to determine competency

On October 15, 2018, defense counsel renewed his motion to determine competency and maintained that the competency standards for trial and for waiving jury are not different. The judge granted the renewed motion and ordered another competency evaluation and hearing. So Wessel was sent back to MCC Chicago for further observation by Dr. Schenk.

**K. Dr. Schenk's second report**

After observing Wessel from January 7 to February 20, 2019, Dr. Schenk issued a report similar to her first. Again, he refused to participate. She suspected he was intentionally trying to avoid or delay proceedings. She concluded he remained competent. She diagnosed him with malingering, antisocial personality disorder, borderline personality disorder, and multiple substance abuse disorders.

**L. Third competency hearing**

The judge held a third competency hearing on May 9, 2019. Dr. Schenk was the only witness. She testified Wessel consistently declined to speak with her but responded to staff directives. She opined his behavior was volitional. She stood by her diagnoses and her conclusion he was competent. Defense counsel asked her how she could diagnose antisocial personality disorder when the criteria for that condition required conduct problems before age 15 and she had no specific examples. She relied on his "long-standing pattern of maladaptive behaviors and traits." She said these "long-standing, ingrained" behaviors did not "just happen overnight." She said his antisocial personality disorder "most likely … manifested in some other way [as a child] whether it was lying, deceitfulness, manipulation. But … Mr. Wessel is a very intelligent individual, so it's not outside the realm of possibility that he's been able to avoid … legal issues or school consequences while he was growing up, but still manifested those traits." She explained he did not have the hallmarks of psychosis. She saw no indication he hallucinated or responded to internal stimuli. When he spoke to others, his speech was organized, relevant, and goal directed. She thought his descriptions of delusions changed, which is

inconsistent with a genuine psychotic delusion. He responded to commands when necessary, when someone in an actual state of psychotic catatonia would have been unable. So she ruled out schizophrenia. She ruled out bipolar disorder because he did not demonstrate manic symptoms. She also confirmed he said he did not remember being at the facility before, but then he addressed a staff member there by name.

Defense counsel insisted Wessel was not competent, and argued he was schizophrenic. Defense counsel said sometimes Wessel did not know who defense counsel was, and did not remember being shot. Defense counsel urged long-lasting antipsychotic medication. He explained the distinction between the cooperation in Kentucky and lack of cooperation in Chicago by noting the delusion about hitmen from Chicago.

**M. Judge's further determination**

On May 13, 2019, the judge issued another entry finding Wessel competent. She noted all experts diagnosed multiple substance abuse disorders and agreed he understood the nature of the proceedings, the roles of the courtroom players, and the possible outcomes. The sole issue, as before, was whether he was reasonably able to assist in his defense. She discussed the experts in detail. She quoted the correct competency standard. She addressed the argument that he did not meet the criteria in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") for antisocial personality disorder because he did not have a history of certain types of bad behavior before age 15. She explained Dr. Schenk's rationale for this diagnosis. And the judge noted he reported conduct problems before 15. She concluded that much of his conduct was volitional and not compulsive. He chose to speak with some people but not with others and engaged in a pattern of

manipulation. Relying on Dr. Schenk and Dr. Campbell, the judge again determined he was competent.

### III. Trial

Trial began June 3, 2019. Defense counsel visited Wessel that morning, but Wessel would not look at him. Wessel said he wanted to go to prison. He refused to don the civilian clothes his attorney provided: "They're not my clothes." Wessel appeared in court in a black-and-white-striped jail jumpsuit. The judge asked if he was ready for trial. No response. The government argued he was merely malingering. Defense counsel argued Wessel was incompetent: "I'm as firmly convinced that Mr. Wessel is incompetent as I am of anything." Wessel had recently asked his attorney for a life sentence. Defense counsel argued the Chicago evaluations were not very good. He noted Dr. Schenk never spoke to Wessel. He suggested medication. The judge noted experts had evaluated Wessel for lengthy periods and had concluded he does not have schizophrenia, his delusions are volitional, and his behavior is malingering and volitional. At times, he is lucid and communicative. She made the interesting point that he signed a jury waiver with his counsel, who would not have allowed him to do that without explaining it and receiving an indication of understanding.

The judge warned Wessel about the risks of wearing a jail uniform during trial. He said, "This is all I got." She let him wear the jail uniform. Defense counsel renewed his objection to competency; argued Wessel's decision about clothing was not knowing, intelligent, or voluntary; and had the record reflect he was "basically just staring down at his bare feet … ." But she noted the experts said trial would be difficult if he

chooses not to cooperate. She called his explanation for not wanting to wear civilian clothing "rational."

The venire entered. During voir dire, Wessel struck the table, rose from his chair, and erupted in a volcano of profanity and accusations, including accusations that the United States was trying to kill him and "It's alien mind control!"

The judge had the venire exit during his outburst. Defense counsel moved for a mistrial. The judge asked Wessel if he wanted to stay in person or observe from a holding tank. He indicated to his attorney he would rather not be in the courtroom. His attorney also noted that before the episode, Wessel said he was freaking out because people were staring at him. The judge denied a mistrial. As she explained her decision, Wessel exploded again in a similar tirade of obscenities and accusations. He was removed. The venire re-entered. The judge admonished it that "disruptive behavior is not evidence of guilt … ." The venire then took a break. Outside its presence, defense counsel confirmed that before the outburst Wessel said he wanted to leave, his back hurt, and he felt the panel was staring at him. Defense counsel added that Wessel "indicated that people were reading his mind through the static … ." The judge opined that his conversation with his lawyer supported the conclusion that the outburst was a rational reaction: he wanted to leave, so he misbehaved, following his modus operandi in prisons to get single cells. She brought him back to the courtroom and advised him of his rights. She told him that if he did not want to be present in the courtroom during the trial, that was fine, but if he wanted to be present he had to assure her he would not have any more outbursts. He stayed silent. The judge took his silence as an implied waiver of his right to be physically present at trial,

given his previous statement that he would rather not be present. The judge found this waiver knowing and voluntary.

Trial proceeded without his physical presence. He watched, or did not watch, in a different room via video feed. After the government rested, the judge brought him back and advised him of his rights to testify or not. She asked defense counsel if he and Wessel discussed the issue. Defense counsel: "Your Honor, I haven't had any rational discussions with Mr. Wessel in three years." Defense counsel conferred with Wessel on the spot and then said, "Your Honor, I believe that Mr. Wessel is going to accept the advice of counsel and not testify." Wessel left again. The attorneys closed. The jury retired and quickly reached a guilty verdict.

## IV. Discussion

Wessel raises one issue on appeal. He argues the judge erred in finding him competent. A court may not put a criminal defendant on trial unless he is competent at the time of trial. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Collins*, 949 F.2d 921, 924 (7th Cir. 1991) ("[D]ue process requires a defendant to be competent to stand trial."). The test for whether a criminal defendant is competent for trial "must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The procedure and test for evaluating competency are codified at 18

U.S.C. § 4241. Either party may move for a hearing to determine defendant's mental competency. The court "shall" grant the motion, or order a hearing *sua sponte*, if there is reasonable cause to believe he "may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The court may order an examination. If the court finds by a preponderance of the evidence that he "is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant" for hospitalization. *Id.* § 4241(d). Wessel argues the judge applied the wrong standard, relied on scientifically unreliable evidence, and ignored compelling evidence of incompetence.[2]

**A. Did the judge apply the wrong standard?**

Wessel urges *de novo* review because the judge applied the wrong standard for competency. The judge, relying on *Price v. Thurmer*, 637 F.3d 831, 833–34 (7th Cir. 2011), wrote that he "need only be able to follow the proceedings and provide the information that his lawyer needs in order to conduct an adequate defense, and to participate in certain critical decisions, such as whether to appeal." He argues this is lower than the actual standard, which is that he must have "sufficient present

---

[2] He does not appeal the decision to allow a prison uniform, the denial of mistrial, the jury admonition, or a reverse video during final instructions.

ability to consult with his lawyer with a reasonable degree of rational understanding … ." *Dusky*, 362 U.S. at 402.

But the judge quoted that exact language from *Dusky* at the outset of her analysis and reiterated that standard throughout. We are not convinced *Price* lowered the *Dusky* standard. And it is clear the judge did not rely solely on *Price*. She began by quoting the proper *Dusky* standard directly. Then she quoted the same proper *Dusky* standard through our decision in *United States v. Garrett*, 903 F.2d 1105, 1116 (7th Cir. 1990). Then she referenced the same proper standard through our decision in *Greer*, 736 F.2d at 1165–66. Then she reiterated the proper standard in her own words. Since there was a mental-health examination, and since the judge applied the proper standard and made findings about Wessel's competency, we review for clear error. *Collins*, 949 F.2d at 924; *United States v. Johns*, 728 F.2d 953, 956 (7th Cir. 1984). It is important that we defer to the district judge because she was in the courtroom, she heard the testimony of the three experts, she was in a position to evaluate their strengths and weaknesses, and she could also evaluate Wessel's demeanor over time.

**B. Did the judge rely on scientifically unreliable evidence?**

Wessel says the only issue in this appeal is his ability to consult with and assist his trial counsel with a reasonable degree of rational understanding. He expressly does not challenge his ability to understand the proceedings, the court participants, or their roles. He also says there is no question that he suffers from mental illness. He claims he does. The judge and the government at various points agreed he does. But two doctors diagnosed Wessel as *not* having a mental illness. More importantly, even if Wessel had a mental illness—and we can accept that at the relevant times he did—the question is: did

he have the sufficient present ability to consult with and assist his trial counsel with a reasonable degree of rational understanding. Mental illness does not necessarily preclude a person from being competent to stand trial. *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984). Dr. Schenk diagnosed antisocial personality disorder and borderline personality disorder. Dr. Campbell diagnosed only borderline personality disorder. Both ruled out schizoaffective disorder. He does not challenge the qualifications of either expert. The judge concluded he suffers from personality disorders: "Borderline Personality Disorder and/or Antisocial Personality Disorder." She concluded he was not presently suffering from a mental disease or defect rendering him incompetent, and he could cooperate if he wanted to. She was well-positioned to make this decision.

He challenges her reliance on Dr. Schenk. She could not identify him at the second competency hearing because she never saw his face or had a conversation with him because he refused. Dr. Schenk accepts the authority of the DSM-V. It calls for evidence of a conduct disorder before the age of 15 to support a diagnosis of antisocial personality disorder. She admitted she did not have any information about any conduct by Wessel before age 15 involving aggression to animals, destruction of property, deceitfulness, theft, or serious violations of rules. But she had a good explanation for her diagnosis of antisocial personality disorder despite the lack of specific examples of conduct disorder before 15. She opined that it is "most likely" that "it manifested in some other way, whether it was lying, deceitfulness, manipulation." She noted Wessel "is a very intelligent individual, so it's not outside the realm of possibility that he's been able to avoid … legal issues or school consequences while he was growing up, but still

manifested these traits." She opined that the antisocial per-
sonality disorder "best conceptualizes his ongoing presenta-
tion … ." She noted his long-standing, ingrained pattern of
maladaptive behaviors and traits is not something that would
just happen overnight. Moreover, Wessel reported to his re-
tained expert, Dr. Callaway, that he first smoked marijuana
when he was 15 or 16, and he typically smoked daily. He said
he was "real hyper," "a wild kid, off the hook, a bad kid … ."
He said he "raised hell in class and … didn't care." And there
are records of misbehavior in kindergarten.

Wessel also challenges Dr. Schenk's diagnosis because she
acknowledged that the occurrence of antisocial behavior can-
not be exclusively during a schizophrenia or bipolar episode
and she acknowledged he was diagnosed with schizoaffective
and bipolar disorder about the same time he engaged in the
conduct she considered antisocial. Wessel references testi-
mony at the May 9, 2019 competency hearing regarding these
acknowledgements. It is true that she acknowledged that
some doctors diagnosed him with bipolar disorder and some
with schizoaffective disorder. And it is true that she acknowl-
edged, with some caveats, that these diagnoses were "proba-
bly" "around" the same time as the "onset" of the behaviors
she characterized as merely antisocial. But even leaving aside
all the potential wiggle room left open in this passage of the
hearing, his argument collapses because Dr. Schenk also tes-
tified: "I don't think he meets the criteria for bipolar disorder
or schizoaffective disorder." He ignores that sentence. So, she
essentially testified that even if antisocial behavior cannot oc-
cur exclusively during schizophrenia or bipolar disorder, and
other doctors diagnosed him with these psychotic disorders
probably around the time of the behavior she characterizes as
antisocial, this is not a problem for her diagnosis because she

disagrees with the other doctors: she does not think he has psychotic disorders. He can disagree with her conclusion, but he cannot fault it for being internally inconsistent.

Wessel notes Dr. Campbell, the other government expert, did not diagnose antisocial personality disorder. She ruled it out because she did not see evidence of bad behavior—"getting into lots of fights, breaking rules, having major behavioral problems"—by age 15. She called this "one of the hallmark criterias of antisocial personality disorder," and she found it lacking. Although Dr. Campbell's conclusion on this point could tend to undermine Dr. Schenk's diagnosis of antisocial personality disorder, this does not take Wessel far. First, the judge did not—and did not need to—draw an ultimate conclusion regarding which personality disorder plagued him. In her orders of June 11, 2018, and May 13, 2019, she concluded: "Wessel suffers from personality disorders— Borderline Personality Disorder *and/or* Antisocial Personality Disorder … ." (Emphasis added.) So she did not take a side in the debate between the two government experts regarding which particular personality disorder he suffered. Second, the judge did not commit clear error in weighing the experts or in declining to agree completely with any of them on non-dispositive points. Third, as noted above, there is some evidence of behavior problems before age 15, including his own report. Fourth, even though the two government experts disagreed about which particular personality disorder plagued him, neither diagnosed him with any psychotic disorder. Both ruled out schizoaffective disorder. Fifth, as noted above, the judge at various points agreed in general that he suffered from mental illness. But, most importantly, even with a mental illness, a defendant can still be competent to stand trial. The judge

committed no clear error in relying on the government's experts.

**C. Did the judge ignore evidence of incompetency?**

Wessel makes much of the fact that the judge determined he could not waive jury but was competent to stand trial. He argues these are incompatible decisions because the standard for each is the same. Relying on *Godinez v. Moran*, 509 U.S. 389 (1993), he argues there is no different standard for competency to waive jury and competency to stand trial. In a sense, he is right. In *Godinez*, the Supreme Court "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." *Godinez*, 509 U.S. at 398. So we have no quarrel with his assertion that there is no different standard for competency to waive jury and competency to stand trial. But that is not the end of the story. *Godinez* goes on to say that a finding that a defendant is competent to stand trial "is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel." *Id.* at 400. In addition to competency, "a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. … In this sense there *is* a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*." *Id.* at 400–01. This logic regarding pleading guilty also applies to waiving trial by jury, one of several constitutional rights waived by a guilty plea.[3] So the district judge was also right.

---

[3] "[T]here is an important distinction between … whether a defendant is competent to waive a right and … whether a given waiver is knowing and voluntary." *St. Pierre v. Cowan*, 217 F.3d 939, 947 (7th Cir. 2000). "[C]ourts

There is nothing necessarily inconsistent with finding a defendant competent to stand trial but denying his attempt to waive jury.[4] A court might reasonably find that a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him," *Dusky*, 362 U.S. at 402, but nevertheless also find that his attempt to waive jury is not knowing, intelligent, or voluntary. Perhaps a perfectly competent defendant's attempt to waive jury must fail because he was simply uninformed (or misinformed, *see St. Pierre*, 217 F.3d at 951; *Hall v. Washington*, 106 F.3d 742, 753 (7th Cir. 1997)) about the nature of a jury or the consequences of waiver. Or perhaps the judge attempted to explain a particular right but still found the defendant did not understand it even though he is competent for trial. *See Brooks v. McCaughtry*, 380 F.3d 1009, 1012–13 (7th Cir. 2004) ("A judge who, having explained the consequences, finds that the defendant doesn't understand them is entitled to conclude that although competent to stand trial, the defendant has not made an effective waiver of his right to counsel and therefore

---

indulge every reasonable presumption against waiver of fundamental constitutional rights … . A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend … upon the particular facts and circumstances surrounding that case … ." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (cleaned).

[4] "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. … The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez*, 509 U.S. at 401 n.12.

may not represent himself."). Or perhaps a perfectly compe-
tent defendant's attempt to waive jury must fail because he
faced an unconstitutional threat to coerce the waiver.

Or perhaps a judge was convinced the government proved
defendant competent by a preponderance, based largely on
the reports and testimony of two experts who evaluated him
over several months and reviewed his records and who
opined he did not have a mental illness rendering him unable
to understand the proceedings or consult with his lawyer and
assist with his defense, and who opined he was competent but
merely chose to be uncooperative. But the judge could not
evaluate whether his attempt to waive jury was knowing, in-
telligent, and voluntary because he chose to misbehave dur-
ing the inquiry. So the judge found defendant competent but
declined to accept his jury waiver. His volitional misbehavior
obstructed her from assuring herself the waiver was knowing,
intelligent, and voluntary.

A criminal defendant has a constitutional right not to
stand trial while incompetent. And he has a constitutional
right to a jury trial. But (with potential exceptions in limited
circumstances not implicated here) he does not have a consti-
tutional right to waive a jury and proceed only before the
judge. *Singer v. United States*, 380 U.S. 24, 34–36 (1965); *United
States v. Clark*, 943 F.2d 775, 784 (7th Cir. 1991); *United States
ex rel. Williams v. DeRobertis*, 715 F.2d 1174, 1178 (7th Cir.
1983). And it appears it is impossible for a criminal defendant
to affirmatively waive his right only to be tried if and when
competent. *See Pate*, 383 U.S. at 384; *Gosier v. Welborn*, 175 F.3d
504, 507 (7th Cir. 1999). If he tried to waive this right *while* in-
competent, the waiver would be *ipso facto* unknowing, unin-
telligent, and involuntary. If he tried to waive this right *before*

becoming incompetent, it would seem as ludicrous as asking for trial by a jury of 12 orangutans. *See United States v. Josefik*, 753 F.2d 585, 588 (7th Cir. 1985); *Drope*, 420 U.S. at 176. Even pleading guilty does not include waiving the right to be tried only when competent, because a guilty plea eliminates trial. But we make no conclusions on this question. Suffice it to say the right to a jury trial in a criminal case is precious. The Constitution and Rule 23(a) protect it. A jury of ordinary people shields a defendant from a government's well-documented tendency to oppress[5] and a specialist's inclination toward complacency or favored minutiae.[6] We have urged district courts to conduct *Delgado* colloquies to help document that jury waivers are knowing, intelligent, and voluntary, even though the Constitution does not require these colloquies. *See United States v. Williams*, 559 F.3d 607, 610 (7th Cir. 2009); *United States v. Rodriguez*, 888 F.2d 519, 526–28 (7th Cir. 1989); *United States v. Delgado*, 635 F.2d 889, 890 (7th Cir. 1981). We insist a jury waiver not only be competent, but also knowing, intelligent, and voluntary.

Here, the judge found Wessel competent on June 11, 2018, based largely on the opinions of Dr. Schenk and Dr.

---

[5] *Duncan v. Louisiana*, 391 U.S. 145, 155–56 (1968).

[6] "Our civilisation has decided, and very justly decided, that determining the guilt or innocence of men is a thing too important to be trusted to trained men. … When it wants a library catalogued, or the solar system discovered, or any trifle of that kind, it uses up specialists. But when it wishes anything done which is really serious, it collects twelve of the ordinary men standing round. The same thing was done, if I remember right, by the Founder of Christianity." G.K. Chesterton, *Tremendous Trifles*, XI. The Twelve Men, https://www.gutenberg.org/files/8092/8092-h/8092-h.htm#link2H_4_0012.

Campbell. Wessel filed a jury waiver on October 11, 2018, signed by him and his attorney. The court inquired of Wessel about the waiver at a hearing the same day. Wessel's answers were often wrong, vague, evasive, or strange. The judge applied the proper "knowing and voluntary" standard, and found his attempted waiver lacking. Wessel does not appeal the rejection of his attempt to waive jury.[7] He only mentions the rejection to argue that if the judge rejected his jury waiver then she should also have found him incompetent for trial. As defense counsel put it on the spot: "Judge, if he's not competent to waive jury, he's not competent to appear in front of a jury." But the judge technically did not find him not *competent* to waive jury. She merely found she could not conclude that his attempted jury waiver was knowing and voluntary. The standard for competency abides, but jury waiver requires an additional inquiry.[8]

---

[7] Wessel does not appeal the denial of his jury waiver, so even if he were right that the standards and inquiries are completely identical, and that the judge's rulings on competency for trial and on the jury waiver were inconsistent, that would not necessarily mean she committed clear error in finding him competent for trial. It might simply mean she was wrong about the jury waiver. Or it might mean something else. Nor does Wessel make arguments based on the judge's finding that his waiver of the right to be physically present for trial was knowing and voluntary.

[8] Wessel argues that if the court harbored doubt about his competence to waive jury, then "[i]t would seem" the government failed to sustain its burden to show competence for trial. Maybe it does seem that way. But it is not. True, in the May 13, 2019 order concluding he was competent for trial, the judge explained as background that she rejected the jury waiver on October 11, 2018, "[b]ecause a doubt of *competency* to waive jury existed … ." (Emphasis added.) But it is clear from context she used the word *competency* here as shorthand. *See Godinez*, 509 U.S. at 401 ("When we distinguished between 'competence to stand trial' and 'competence to waive

True, the judge might have viewed Wessel's strange be-
havior during the jury-waiver colloquy and his obscene erup-
tion during voir dire as evidence of incompetence. Even after
a judge determines defendant to be competent, reassessment
is crucial as proceedings continue. But as the fact-finder she
could also have reasonably viewed his behavior the way she
did: as volitional, maladaptive malingering, predicted by the
government experts. She denied the motion for a mistrial after
the voir dire volcano because "[t]he defendant can't *intention-
ally* cause a mistrial by being disruptive in the courtroom."
(Emphasis added.) She referenced the experts who concluded
he is not incompetent, he malingers, and his behavior is inten-
tional. She determined the outburst was a "rational reaction."
He wanted to leave the courtroom, his back hurt, he did not
like the panel staring at him, so he chose to shout obscenities
to manipulate. The judge noted he had a history of manipula-
tion to get a single cell. So the judge committed no clear error
in determining Wessel was competent for trial even though
she denied his attempted jury waiver.

Wessel also seems to argue the judge did not adequately
address the fact that he refused to leave prison when a prior
sentence ended, and he told his attorney in the present case
that he wanted to receive a longer sentence than possible. She

[the] constitutional right to the assistance of counsel,' … we were using
'competence to waive' as a shorthand for the 'intelligent and competent
waiver' requirement of *Johnson v. Zerbst*."). Two sentences earlier she
noted she "*sua sponte*, initiated an inquiry of Wessel to determine whether
his waiver was knowing and voluntary … ." And she referenced the
"knowing and voluntarily" standard on October 11, 2018. Besides, she at
various points *did* harbor some doubt about Wessel's basic competence.
That is why she ordered multiple evaluations and hearings. And the gov-
ernment need not prove competence beyond a reasonable doubt.

wrote in her May 13, 2019 order: "His desire to remain or serve long terms in penal custody may be indicative of wanting to be some place safe and without responsibility, rather than a delusional request." We see no clear error here.

Finally, Wessel also argues the judge did not carefully weigh his counsel's strenuous position. True, counsel was uniquely situated to observe his client, so counsel's position "is unquestionably a factor which should be considered." *Drope*, 420 U.S. at 177 n.13. And true, defense counsel vigorously, continuously, and unequivocally challenged competency. But we see nothing in the record to indicate the judge did not consider and carefully weigh his position. To the contrary, she took him very seriously. She entertained doubts. She ordered multiple evaluations and competency hearings. She assessed and re-assessed. Again, we see no clear error. We commend Chief Judge Pratt. She exercised great patience, took many steps to assess Wessel's competency and respect his rights, and demonstrated open-mindedness all along the case's long, zig-zag path.

## V. Conclusion

The judge committed no clear error in finding Wessel competent to stand trial, so we affirm.[9]

---

[9] Wessel has our sympathy.