In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 24-1652 & 24-1685

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FALANDIS RUSSELL and TERRANCE WILLIAMS,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cr-107 — **Edmond E. Chang,** *Judge.*

———————————

ARGUED APRIL 14, 2025 — DECIDED JUNE 11, 2025

———————————

Before BRENNAN, ST. EVE, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Defendants Falandis Russell and Ter-
rance Williams pleaded guilty to one count of conspiracy to
obstruct commerce by robbery and multiple counts of ob-
struction of commerce by robbery. Both defendants now ap-
peal. Russell challenges the district court's determination that
he was competent to stand trial as well as the procedural
soundness of his sentence. Williams objects to a supervised
release condition requiring him to notify another person if his

probation officer determines that he poses a risk to that person. For the reasons discussed below, we affirm Russell's conviction and sentence, and we vacate the challenged condition imposed on Williams and remand for further proceedings.

**I**

For nearly a year and a half, Russell and Williams committed a series of armed commercial robberies throughout Chicago. They were eventually indicted for conspiracy to obstruct commerce by robbery in violation of 18 U.S.C. § 1951(a) (Count One). In addition, Russell was charged under the same statute with eleven counts of obstruction of commerce by robbery (Counts Two through Twelve), while Williams was charged with six (Counts Five through Ten).

**A**

During pretrial proceedings, Russell's counsel filed an *ex parte* motion for the appointment of a forensic psychologist to assess Russell's cognitive capacity, which the district court granted. The appointed psychologist, Dr. Melissa Jajko, conducted a psychological evaluation of Russell, diagnosed him with an intellectual disability and attention-deficit/hyperactivity disorder, and recommended that he undergo further evaluation to determine his fitness to stand trial.

In arriving at her conclusions, Dr. Jajko administered several intellectual functioning tests, the results of which, she warned, "should be interpreted with caution" "[d]ue to [Russell's] inadequate effort." Additionally, Dr. Jajko interviewed Russell and his mother and reviewed his school records that indicated sparse attendance. Dr. Jajko did not review Russell's Bureau of Prisons (BOP) records or Social Security disability benefit records.

Based on Dr. Jajko's recommendation, both the government and defense requested a competency examination of Russell pursuant to 18 U.S.C. § 4241(a). The court agreed, finding reasonable cause to believe Russell may be incompetent. The court was particularly concerned about his ability to properly assist in the preparation of his defense.

With the court's approval, Dr. Jajko conducted Russell's competency examination and submitted a report, opining that Russell was unfit to stand trial. To conduct her evaluation, Dr. Jajko interviewed Russell, although the session was cut short due to Russell's inability to "adequately participate" (which Dr. Jajko attributed to his "observed and documented cognitive impairments"). Dr. Jajko also reviewed Russell's prison and health records for the six months preceding the examination. But, again, she did not review his Social Security records.

Based on Dr. Jajko's report (and without objection from the government), the district court found by a preponderance of the evidence that Russell suffered a mental disability rendering him unable to properly assist in his defense. As a result, the court remanded Russell to the custody of the United States Attorney General for further evaluation and treatment in accordance with 18 U.S.C. § 4241(d). Russell was subsequently transferred to the Federal Medical Center in Butner, North Carolina, for treatment.

About four months later, Dr. Marina Muhkin, a BOP psychologist who evaluated Russell during his time at FMC Butner, submitted a forensic report, opining that Russell was competent to proceed to trial. Dr. Muhkin grounded her opinion on a series of clinical interviews with Russell, observations of his behavior, and psychological testing. She also reviewed Russell's BOP records, school records, criminal history

records, and Social Security records. The Social Security records were particularly noteworthy because they indicated a greater acuity with intellectual tasks, such as simple mathematics and recall.

What is more, Dr. Muhkin observed that "Russell displayed a deliberate suppression on tests of effort of cognitive abilities" and "achieved a profile suggestive of Feigning." She also remarked that "[g]iven the defendant's poor motivation to present his psychological functioning accurately, the … subjective impressions should be viewed with caution."

Defense counsel objected to Dr. Muhkin's conclusions of Russell's competency. And so, the parties agreed to jointly retain another forensic expert, Dr. Stephen Dinwiddie, for a third psychological opinion.

As part of his analysis, Dr. Dinwiddie examined Russell and reviewed his BOP records, school records, criminal history records, and Social Security records. Dr. Dinwiddie also reviewed the evaluations of Drs. Jajko and Muhkin.

Based on this review, Dr. Dinwiddie concluded that, "from a psychiatric perspective, there are no barriers to considering Mr. Russell competent to stand trial." "Mr. Russell's poor performance on a number of assessments," Dr. Dinwiddie continued, "is best explained by a conscious attempt to misrepresent his intellectual abilities." Further, "[n]o psychiatric disease or defect is identified that would render Mr. Russell unable to consult with his lawyer with a reasonable degree of rational understanding or render him unable to have a rational as well as factual understanding of the proceedings against him."

The district court subsequently held a multi-day competency hearing, at which Drs. Jajko, Muhkin, and Dinwiddie all testified. Russell's mother testified as well. And the government introduced in evidence Russell's school records, Social Security records, BOP medical records, and some of his recorded telephone calls while in BOP custody.

In the end, the district court concluded that "Russell is mentally competent: he understands the nature and consequences of the proceedings against him and he can assist properly in his defense." In doing so, the court discussed the testimony of the three experts along with the other evidence presented at the hearing. The court was careful to note that it was "not rejecting the notion that Russell suffers an intellectual disability at all. But he simply does not suffer a cognitive impairment that renders him incompetent."

**B**

Both Russell and Williams ultimately pleaded guilty. Russell entered a conditional plea of guilty on Counts Seven, Eight, and Ten, reserving the right to challenge the court's competency determination. As part of the plea, Russell stipulated to having committed three additional robberies during the relevant time period. As for Williams, he pleaded guilty to Count Five, acknowledging that he had committed six additional robberies during the same time period.

In anticipation of Russell's sentencing hearing, the probation department prepared a presentencing investigation report (PSR). In addition to attributing thirteen robberies to Russell (the six in his plea agreement and seven additional robberies that the government contended he committed

during the same period), the PSR calculated Russell's guideline range to be 121 to 151 months of imprisonment.

At the sentencing hearing, the district court resolved a guideline dispute not relevant here and determined Russell's sentencing guidelines range to be 97 to 121 months of imprisonment. The government then recommended an above-guideline sentence of 300 months' imprisonment, while the defense asked for 121 to 151 months. After hearing from Russell himself, the court imposed a sentence of 180 months of imprisonment and 60 months of supervised release.

To explain the above-guideline sentence, the district court noted the large number of armed robberies Russell had committed and emphasized the "extreme fear and terror" and "lifelong consequences" that he and his co-conspirators "struck in the minds and hearts" of dozens of victims. The court also referenced Russell's criminal history, including convictions for three residential burglaries and possession of a firearm while a felon, which placed him in criminal history category II. And, having found by a preponderance of the evidence that Russell had committed the seven additional robberies described in the PSR, the court observed that Russell's guideline range did not account for these other robberies.

In terms of mitigation, the court acknowledged Russell's "cognitive impairments." But, when imposing the sentence, it underscored "the need for specific deterrence, general deterrence, the protection of the public, and most significantly to reflect the seriousness of the offense that was committed."

Williams's sentencing hearing took place about two weeks later. Unlike Russell's, Williams's guideline range of 97 to 121 months' imprisonment accounted for six of the seven

acknowledged robberies (the one to which he pleaded guilty and six additional robberies to which he stipulated). Williams also had zero criminal history points, placing him into criminal history category I. And the court ultimately sentenced Wiliams to a within-guidelines sentence of 114 months of imprisonment.

The district court then discussed the differences between Williams's and Russell's custodial sentences. The court observed that, unlike Williams, Russell had a criminal history as an adult and had committed six more robberies than Williams. But the court also acknowledged that Russell suffered from "a more intense cognitive impairment."

When it came to Williams's supervised release, the probation department recommended the imposition of a supervised release condition that would require Williams to inform another person of his record of arrests, convictions, substance use, and other indicia of risk, if his probation officer were to determine that Williams poses a risk to that other person.

Williams objected to the condition, but the court nonetheless imposed it with two amendments. First, it removed the reference to arrests. Second, it required the probation officer to provide Williams with seven days' notice so he could file an objection. The resulting condition read:

> [I]f the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of convictions and substance abuse. The probation officer

may contact the person and confirm that you have told the person about the risk. The Defendant may file, within seven days of being informed of the proposed notification, a written objection with the Court.

## II

We begin with Russell's claims that the district court's competency determination was clearly erroneous and that his sentence was procedurally defective. We then turn to Williams's challenge to the supervised release condition.

## A

"A court may not put a criminal defendant on trial unless he is competent at the time of trial." *United States v. Wessel*, 2 F.4th 1043, 1053 (7th Cir. 2021) (citations omitted). "To stand trial a defendant must have both a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Nichols*, 77 F.4th 490, 498 (7th Cir. 2023) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). We review a district court's finding of competence to stand trial for clear error. *See Wessel*, 2 F.4th at 1054 (citations omitted).

Russell offers two arguments against the district court's competency finding. First, he contends that the district court wholly disregarded Dr. Jajko's opinion that Russell was unfit for trial. Second, in his view, the court improperly credited the competency determinations of Drs. Muhkin and Dinwiddie, neither of which, he claims, finds support in the record. Neither argument is convincing.

First, the district court did not disregard Dr. Jajko's assessments. To the contrary, the district court's order discussed Dr.

Jajko's evaluation in depth, ultimately discounting it for several reasons. For example, the court took issue with Dr. Jajko's failure to review Russell's Social Security records and his other past psychological evaluations. The court also found that Dr. Jajko "failed to adequately examine whether Russell was malingering," despite observing his low effort on her tests. Russell may disagree with the district court's decision to give Dr. Jajko's opinions little weight, but this does not make the decision clearly erroneous. *See Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) ("[I]n a case of dueling experts … it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.").[1]

As for Drs. Muhkin and Dinwiddie, Russell attempts to discredit their opinions by pointing to purported deficiencies in their evaluations. For example, Russell criticizes Dr. Muhkin for failing to consider his cognitive deficits as the cause of his poor school attendance (rather than the effect), for encouraging him to guess on certain test questions, and for not participating in his competency restoration program while he was at FMC Butner. As for Dr. Dinwiddie, Russell faults him for not personally conducting any tests, for misplacing some of his notes, and for overlooking the possibility that Russell's intellectual ability is even lower than documented. The problem is that Russell does not explain how any

---

[1] Russell relies on our unpublished decision in *United States v. Wabol*, 182 F. App'x 530 (7th Cir. 2006). But that case is inapposite because, there, "[t]he only evidence presented at the first competency hearing was the testimony of the government psychologist who concluded after examining Wabol that he was *not* competent to stand trial. The prosecutor, in fact, conceded that Wabol was *not* competent, and Wabol's counsel did not argue otherwise." *Id.* at 532 (emphases added). None of that is true here.

of these alleged shortcomings, even if valid, so fatally under-mined their opinions as to make the court's reliance upon them clearly erroneous.

Russell also argues that Drs. Muhkin and Dinwiddie were evasive during the hearing. But "[w]e give a district court's credibility determinations of expert witnesses 'great weight.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1069 (7th Cir. 2013) (citation omitted), and the district court here certainly considered their opinions more persuasive than Dr. Jajko's.

This makes sense given this record. Unlike Dr. Jajko, Drs. Muhkin and Dinwiddie based their opinions on a more com-plete review of Russell's record. For instance, Dr. Muhkin considered Russell's ongoing clinical interviews, her own per-sonal observations of Russell's behavior at FMC Butner, and other tests administered over time. As for Dr. Dinwiddie, it is true that he did not conduct his own tests and admittedly did not always keep contemporaneous notes. But he did conduct a more thorough review of Russell's prior records than Dr. Jajko. And both Drs. Muhkin and Dinwiddie reviewed his So-cial Security records, while Dr. Jajko did not. Given this, the district court's reliance upon their opinions was not clearly erroneous.

But that was not all. In addition to weighing the opinions of the three experts, the district court took into account Rus-sell's school records and prison telephone calls. Both, the court found, evinced his capacity to communicate effectively with others. Take the recordings of Russell's telephone calls from jail. The court observed that the call records "present[ed] Russell as an engaged conversant who understands what is said to him, who can respond to others, and who indeed can

make his ideas and thoughts known (sometimes quite insistently)."

At the same time, the court recognized that Russell suffered from some mental illness. But, as the court aptly pointed out: "Mental illness, by itself, does not constitute incompetence." *See also Price v. Thurmer*, 637 F.3d 831, 833–34 (7th Cir. 2011) ("The fact that a person suffers from a mental illness does not mean that he's incompetent to stand trial. He need only be able to follow the proceedings and provide the information that his lawyer needs in order to conduct an adequate defense, and to participate in certain critical decisions, such as whether to appeal."). Thus, the finding of the district court that Russell was competent to stand trial was not clearly erroneous.

**B**

Russell also contends that the district court procedurally erred when it sentenced him. "A sentencing court commits procedural error by not adequately explaining its choice of sentence." *United States v. Garcia-Oliveros*, 639 F.3d 380, 381 (7th Cir. 2011) (citations omitted). The sentencing judge must, "at the time of sentencing, … state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). We evaluate the sentence *de novo* for procedural error. *United States v. Jerry*, 55 F.4th 1124, 1130 (7th Cir. 2022).

According to Russell, the district court ignored his principal mitigation argument that he suffered from intellectual disabilities. The record, however, is to the contrary. At sentencing, the district court expressly recognized Russell's cognitive impairments, remarked how such impairments could make custody more difficult, and assured Russell that it would take

that into account. And, as the transcript illustrates, the court did so when crafting the sentence. This is sufficient. *See United States v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) ("A district judge must address the defendant's principal arguments made in mitigation, but the explanation can be implicit or imprecise and does not need to be extensive.").[2]

Nonetheless, Russell submits that the disparity between his sentence and that of Williams (which was 66 months shorter) demonstrates that the court failed to adequately consider his cognitive impairments as mitigation. But the sentencing disparity by itself does not prove that the district court failed to consider Russell's cognitive impairments; the transcript shows that the court did. And the court explained the reasons for the difference when it sentenced Williams.[3]

Additionally, Russell takes issue with the sufficiency of the district court's sentencing explanation. But, again, the transcript indicates that the court provided a detailed discussion of the relevant sentencing factors under 18 U.S.C. § 3553(a) and how they impacted Russell's sentence.

---

[2] Russell cites our decision in *United States v. Poulin*, 745 F.3d 796 (7th Cir. 2014). That case is distinguishable because, there, the district judge "explicitly stated that he did not know the exact context of [the defendant's] argument, simply referring to it as 'some comment.'" *Id.* at 801. By contrast, here, the district court acknowledged and considered Russell's argument.

[3] We also reject Russell's contention that the court's consideration of his cognitive impairment somehow "presents ambiguity." The court clearly considered Russell's cognitive impairment to be a mitigating factor, while it deemed his exaggeration of it to be an aggravating factor.

Accordingly, Russell's procedural challenge to his sentence lacks merit.[4]

## C

Turning to Williams's appeal, he argues that the notification condition the court imposed as part of his supervised release is unconstitutionally vague, violates Article III's non-delegation principle, and implicates government-compelled speech in violation of the First Amendment. We generally review contested supervised release conditions for abuse of discretion. *United States v. Bickart*, 825 F.3d 832, 839 (7th Cir. 2016). However, a vagueness challenge is a legal question subject to *de novo* review. *United States v. Sandidge*, 863 F.3d 755, 758 (7th Cir. 2017).

For its part, the government does not dispute that certain terms in the condition are vague. We agree for the reasons we previously discussed in *United States v. Kappes*, 782 F.3d 828, 849 (7th Cir. 2015), and *Bickart*, 825 F.3d at 841–42. Accordingly, we remand to the district court for the limited purpose of considering the necessity and scope of that condition.

## III

For the foregoing reasons, we AFFIRM Russell's conviction and sentence, and we VACATE Special Condition No. 13 imposed on Williams as part of his supervised release and

---

[4] To the extent that Russell also contends that his sentence was substantively unreasonable because it was "excessive," we decline to consider an issue that was "insufficiently developed" in his briefs. *See United States v. Figueroa*, 622 F.3d 739, 744 (7th Cir. 2010) (citation omitted).

REMAND for further proceedings consistent with this opinion.